Colonial Engineering Co., Inc. of Springfield v. Commissioner.
Colonial Engineering Co. v. Commissioner
Docket No. 87957.
United States Tax Court
T.C. Memo 1963-287; 1963 Tax Ct. Memo LEXIS 58; 22 T.C.M. (CCH) 1476; T.C.M. (RIA) 63287; October 22, 1963
*58 Held, that the petitioner corporation is entitled to a deduction of $15,000 for its fiscal year 1957, representing the amount which it paid during said year in compromise settlement of a judgment for damages, entered against it in the Superior Court of Massachusetts, for causing loss of business profits and income to the plaintiff in said suit. William J. Duiker, 1412-34th St., N. W., Washington, D.C., for the petitioner. John R. Berman, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in the income taxes of the petitioner corporation for its fiscal years ended May 31, 1956 through 1958, as follows: Fiscal Year Ended
May 31
Deficiency
1956
$2,341.12
1957
3,822.19
1958
12.51
The sole issue for decision is whether the petitioner is entitled to a deduction of $15,000 for its fiscal year 1957, representing the amount which it paid in that year in compromise settlement of a judgment for damages, which had been entered against it in the Superior Court of Massachusetts in a suit instituted by a former stockholder. No error was assigned by petitioner with respect to *59 respondent's determinations of deficiencies for the other two years, 1956 and 1958. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and all exhibits identified therein are incorporated herein by reference. The petitioner, Colonial Engineering Co., Inc. of Springfield, is a corporation organized under the laws of the Commonwealth of Massachusetts and having its principal place of business at Springfield, Massachusetts. Its income tax return for its fiscal year ended May 31, 1957, was filed with the district director of internal revenue at Boston. Petitioner's principal business at all times material was that of providing, under contracts with customers, engineering services and research, development and design of tools and products. During 1953 and 1954, a substantial portion of its services were performed under three research and development contracts with the Springfield Ordnance District of the United States Army. Prior to August 20, 1954, all of petitioner's issued and outstanding shares of stock (consisting of 150 shares of common stock) was held in equal portions by three stockholders: Robert M. Hallam, Fred W. Kessler, and Ben Swirsky. *60 At that time, Hallam was president and had charge of sales; Kessler was treasurer and had charge of the management of the office; and Swirsky was vice president. These same three stockholders were also the directors. Sometime during the early summer of 1954, friction developed between Hallam and Swirsky with regard to the operation of petitioner's business. The result was that Hallam and the other stockholders negotiated an arrangement under which Hallam would completely sever all connection with petitioner and surrender to it all of his shares of stock for an agreed price of $40,000 in cash; and also under which Hallam would be permitted to take with him certain engineering and office equipment and any personnel of petitioner who might wish to go - in order to enable Hallam to establish a competing engineering business of his own, as a sole proprietor. Thereupon for the purpose of effectuating this arrangement, a written agreement was prepared (and subsequently executed, as hereinafter shown) which provided as follows: AGREEMENT This agreement made this twentieth day of August, 1954 between ROBERT M. HALLAM of Springfield, Hampden County, Massachusetts and the COLONIAL ENGINEERING *61 CO., INC. OF SPRINGFIELD, a corporation duly organized according to law and having a usual place of business in said Springfield, Hampden County, Massachusetts. WITNESSETH: That in consideration of the surrender by Robert M. Hallam of all his stock, right, title and interest in said Colonial Engineering Co., Inc. to said Colonial Engineering Co., Inc. the said corporation agrees to pay Robert M. Hallam forty thousand (40,000.) dollars in cash and to turn over to him certain equipment and perform certain other obligations hereafter set out. On the execution of this agreement the following shall take place: STOCK I. Robert M. Hallam shall turn over all his stock in the Colonial Engineering Co., Inc. to the corporation and shall resign all his office and duties in the said corporation. CASH PAYMENT II. Colonial Engineering Co., Inc. shall pay Robert M. Hallam forty thousand (40,000.) dollars in cash. EQUIPMENT III. Colonial Engineering Co., Inc. shall turn over to Robert M. Hallam the following engineering and office equipment: One mahogany executive's desk and chair One gray steel secretary's desk and chair One gray steel supervisor's desk and chair One barred *62 gray steel drawing file, eight drawers One 24 space steel coat rack Four 4-drawer Barred files Five 15-ft. drawing boards Three Emmert machines Fifteen 5-ft. drawing boards, straight-edges and hardware Fifteen Reference tables with horses and plywood reference tables Twenty-four steel drafting stools LOAN IV. Colonial Engineering Co., Inc. shall repay the loan made by Robert M. Hallam to the said corporation in the amount of One thousand six hundred forty-six and 64/100 Dollars ($1,646.64). PERSONNEL V. For the purpose of continuing in an engineering business of his own the said Robert M. Hallam may take with him any personnel who wish to go. The fact that Robert M. Hallam is taking personnel with him shall not be a breach of any duty he owes the Colonial Engineering Co., Inc. nor shall it work to the prejudice of any of the individuals involved. Colonial Engineering Co., Inc. agrees to pay said personnel as of the date of their termination. VI. On the execution of this agreement Colonial Engineering Co., Inc. agrees to pay Robert M. Hallam his weekly wages up to and including August 20, 1954. IN WITNESS WHEREOF the parties hereto set their hands and seals *63 on the day first above written, Colonial Engineering Co., Inc. by Fred W. Kessler, Treasurer and Benjamin Swirsky, Vice President and Robert M. Hallam individually. COLONIAL ENGINEERING CO., INC. OF SPRINGFIELD By /S/ Fred W. Kessler Treasurer and /S/ Benjamin Swirsky Vice President /S/ Robert M. Hallam Robert M. Hallam A day or two following the time when all terms of said Agreement had been agreed upon, but before the same was actually executed, Hallam requested that a Supplemental Agreement also be prepared and executed by the three stockholders. Under the suggested terms of this Supplemental Agreement, Hallam would be given permission to solicit any of petitioner's customers including the Springfield Ordnance District whose contracts he had theretofore personally negotiated, with a view to having Hallam, rather than petitioner, perform future research and development services for such customers; and also under which, in the event that Hallam thereafter succeeded in procuring any of the customer accounts, then petitioner would upon request of Hallam "release the parties involved in said contracts, accounts and data," so that Hallam might thereafter personally perform future *64 engineering, research and development services for such customers. All the stockholders were agreeable to this arrangement; and accordingly the following Supplemental Agreement was prepared (and was subsequently executed, as hereinafter shown): SUPPLEMENTAL AGREEMENT In consideration of the execution of an agreement of even date between Colonial Engineering Co., Inc. of Springfield and Robert M. Hallam whereby the Colonial Engineering Co., Inc. has purchased all the right, title and interest of Robert M. Hallam in said corporation, the parties make this supplemental agreement, which shall be a part thereof. WHEREAS, Robert M. Hallam is leaving the said Colonial Engineering Co., Inc. and wishes to establish an engineering company of his own, and WHEREAS, Colonial Engineering Co., Inc. is willing to release to said Robert M. Hallam any contracts which it now has under the conditions hereinafter set out. NOW THEREFORE, it is agreed: I. That Robert M. Hallam may solicit any of the contracts or accounts now held by the Colonial Engineering Co., Inc. including the ones involving Springfield Ordnance District Research and Development. II. In the event that Robert M. Hallam procures *65 the transfer or assignment of any contracts or accounts now held by Colonial Engineering Co., Inc., Colonial Engineering Co., Inc. agrees to release the parties involved in said contracts, accounts and data in order to effectuate said transfer, provided Colonial Engineering Co., Inc. is itself released and discharged on said contracts. III. Robert M. Hallam agrees to execute an agreement to save the Colonial Engineering Co., Inc. harmless from its liability on any contracts transferred. IV. Colonial Engineering Co., Inc. shall pay to Robert M. Hallam within a reasonable time and no later than ten (10) days after the transfer of any of said contracts the money held by it or due it for prepaid work, adjusted as of the date of the transfer of said contract or contracts. IN WITNESS WHEREOF the parties hereunto set their hands and seals on this twentieth day of August, 1954, Colonial Engineering Co., Inc. by Fred W. Kessler, Treasurer and Benjamin Swirsky, Vice President and Robert M. Hallam individually. COLONIAL ENGINEERING CO., INC. OF SPRINGFIELD By /s/ Fred W. Kessler Treasurer and /s/ Benjamin Swirsky Vice President /s/ Robert M. Hallam Robert M. Hallam Both the above-mentioned *66 original Agreement and the above-mentioned Supplemental Agreement were executed on the same date of August 20, 1954; and both became effective as of that date. At the time of such execution, Hallam surrendered all his shares of stock to petitioner for its treasury; and the petitioner paid Hallam the sum of $40,000 for the same, as previously agreed. Hallam, following such severance of his relationship with petitioner, proceeded to organize his contemplated new engineering proprietorship. And also, pursuant to the permission granted him under the abovementioned Supplemental Agreement, he solicited the officials of the Springfield Ordnance District with a view to having him (Hallam) personally perform the future engineering research and development services for that District. Such solicitation was successful; and thereupon Hallam made demand upon petitioner to "release" said Ordnance District from its then existing contracts and accounts. This, petitioner refused to do. Instead, petitioner itself thereafter performed the future research and development services for the Ordnance District, to the detriment of Hallam. On October 21, 1954, Hallam filed a suit against petitioner in the *67 Superior Court of Massachusetts, in which he made claim for damages in the amount of $45,000. This suit, so far as here material, was based on petitioner's refusal to carry out its obligation which Hallam had obtained upon execution of the Supplemental Agreement of August 20, 1954, "to release the parties involved" in the contracts with the Springfield Ordnance District; and it made claim to damages for loss of personal compensation and profits for a period subsequent to petitioner's refusal, which petitioner would have earned if the Ordnance District had at that time been released. The Superior Court assigned the case to an Auditor, who was one of its officers performing duties similar to those of a master or special commissioner. This Auditor set the case for trial, received evidence, and shortly after the beginning of the year 1957 filed his report therein. In this report, the Auditor decided: That the suit was in substance "a claim for damages"; "that there was a refusal on the part of Colonial" to carry out the provisions of the Supplemental Agreement which Hallam had theretofore obtained; that such refusal had occurred on September 24, 1954 (subsequent to the execution of said *68 Supplemental Agreement); that several of the items of damage claimed by Hallam were not properly allowable; but that Hallam was entitled to recover damages as follows: $7,862.46 representing "a loss of profits" for a period subsequent to petitioner's refusal of September 24, 1954; and $12,500 representing compensation which would have become payable to Hallam by the Springfield Ordnance District subsequent to said refusal of petitioner (computed at the rate of $250 per week for 50 weeks beginning on said date of September 24, 1954). The Auditor then found and concluded that Hallam was entitled to receive damages from petitioner in the total amount of $20,362.46 (the aggregate of the above-mentioned amounts), together with interest thereon from the date of the writ, October 21, 1954. Under Massachusetts law, an Auditor's report is in effect a final judgment, unless the losing party seeks a trial de novo in the Superior Court. Subsequently on April 22, 1957, petitioner and Hallam entered into a compromise settlement of the damages awarded to Hallam by the Superior Court Auditor. Pursuant to this compromise settlement, petitioner paid $15,000 to Hallam prior to May 31, 1957, in *69 full and final settlement of said damages; and petitioner did not seek a trial de novo. Petitioner, in its income tax return for its fiscal year ended on May 31, 1957, deducted as one of its "Schedule K - Other Deductions" the $15,000 paid to Hallam in said year in "Compromise Settlement of Judgment for Damages." The respondent, however, in his notice of deficiency herein, disallowed said deduction with the following explanation: It has been determined that you are not entitled to the deduction for judgment damages * * * in the amount of $15,000.00 because the $15,000.00 payment represented part of the purchase price of treasury stock. Opinion The basic controversy in this case is: How should the amount of $15,000 which the petitioner-corporation paid in compromise settlement of the judgment for damages that the Superior Court of Hassachusetts had entered against petitioner and in favor of Hallam, be classified and treated for income tax purposes? The petitioner claimed this amount as a deduction for the year in which the litigation in the Superior Court was terminated and said $15,000 was paid. The respondent, on the other hand, determined and here contends that this amount *70 should be treated as a nondeductible capital expenditure, representing "part of the purchase price of treasury stock" which petitioner had acquired from Hallam nearly 3 years previous to the time of said $15,000 payment. Respondent's contention on brief is in substance: That(1) the original "Agreement" between the parties which specifically fixed the price that petitioner paid for Hallam's stock upon the latter's severance of his connections with the corporation, and (2) the subsequently negotiated but concurrently executed "Supplemental Agreement" under which petitioner agreed to "release the parties [i.e., customers] involved" in any of its existing contracts and accounts (including those of Springfield Ordnance District) if, when, and to the extent that Hallam might thereafter be successful in soliciting the accounts of such customers, should both be regarded as constituting "one purchase and sale agreement" for the acquisition of Hallam's stock; and that, based on said hypothesis, since the $15,000 which petitioner paid to Hallam in compromise settlement of the Superior Court's award of damages for Hallam's lost profits and compensation was in such manner "tied in" with the stock *71 purchase Agreement, the result should follow that the $15,000 paid as damages in 1957 should retroactively be carried back to the year 1954, and be applied as of that year to adjust petitioner's cost and cost basis for Hallam's stock, to an amount in excess of the $40,000 which had not only been agreed upon by the parties but also had been fully paid in said prior year 1954. In support for such argument, respondent has cited and relied upon certain cases, typical of which are , and , wherein amounts paid in settlement of disputes that directly involved the prices (not previously fixed or agreed upon) at which certain partnership interests or certain shares of corporate stock were to be transferred, was held to represent the "sale prices" actually paid for such partnership interests or stock. It is our opinion that respondent's said contention is unsound, in that (1) it fails to give adequate consideration to all the evidence regarding the nature and substance of the particular claim which gave rise to the litigation in the Superior Court, wherein the judgment for damages was entered; and *72 (2) that it fails also to observe that such damages were awarded, not to cover any deficiency in the agreed price for the stock that previously had been transferred but rather for loss of potential future profits and future personal compensation to Hallam in respect of engineering services that were in the future to be performed by him for a third party. We think also that respondent's reliance on the cases above mentioned is misplaced, in that these cases (unlike the present case) directly involved amounts paid in settlements of disputes regarding the non-agreed prices for certain business interests there involved; and accordingly, that said cases are distinguishable on their facts. In our view it makes no practical difference whether the original "Agreement" and the subsequently negotiated but concurrently executed "Supplemental Agreement" be regarded to be two separate agreements, or as parts of a single agreement; for irrespective of how the agreements may be so regarded, it was only the particular covenant contained in section II of the Supplemental Agreement (and not the whole of both Agreements) which gave rise to the Superior Court litigation and to the payment of the damages *73 here involved. The original Agreement, as shown on its face, pertained to matters that were distinct and different from those dealt with in the Supplemental Agreement, i.e.: (1) To an obligation of Hallam to "surrender * * * all his stock, right, title and interest" in the petitioner corporation; and (2) to petitioner's obligation, "in consideration" for such surrender of stock, "to pay Robert M. Hallam forty thousand (40,000.) dollars in cash and to turn over to him certain equipment and perform certain other obligations hereafter [in said original Agreement] set forth." (Italics supplied.) Thus the terms of the original "Agreement" were all definitely fixed and settled by the parties themselves. And pursuant to such agreed terms, Hallam, at the time of the execution of said Agreement surrendered all his shares of stock to the petitioner for retention by it as treasury stock; and the petitioner, at that same time, fully paid to Hallam the agreed $40,000 price. At no subsequent time, either in the Superior Court litigation or otherwise, was there ever any dispute or litigation regarding the transfer of said stock or regarding the fact that the agreed $40,000 price had been fully *74 paid. At the trial herein, Fred W. Kessler who had participated in the negotiations of the above-mentioned Agreements, testified: Q. Now, when you entered into this agreement [original "Agreement" for Hallam's withdrawal from the corporation] * * * did you as an officer of the corporation believe that you ever would pay any more for Hallam's stock? A. No. Once that $40,000 was paid, I figured that was the end of it. Q. If you know, could you tell me whether that was a fair value for the 50 shares of stock? A. According to the figures on the book, that was more than a fair value. The net worth of the corporation at that time was just a little less than $50,000. So I would say that the $40,000 for a one-third share [of such net worth] was more than ample. * * *
Q. Could you again repeat for the Court why the supplemental agreement was entered into? A. As stipulated in the original agreement, Mr. Hallam was desirous of going into business for himself. And as such, he wanted to make sure that there would be no friction between the company and himself in future contracts. We had to agree, in effect, that he could enter into business, he could contact any customer *75 or any contract or any account that we had on the books. * * * The original agreement for $40,000 was the amount of money that was to be paid for the stock. * * * Q. But wasn't the supplemental contract made a part of the original contract? A. When you say, "a part of," if you mean that the supplemental agreement was supposed to be additional payment for stock, then the answer is no. [Italics supplied.] Turning now to the Supplemental Agreement, it will be observed that the provisions thereof did not relate to the sale of the stock, but rather they served two distinct and separate purposes, i.e.: (1) Petitioner granted permission to Hallam to solicit the accounts of its customers (including the Springfield Ordnance District) with a view to enabling him, rather than petitioner, to personally perform the future engineering, research and development services for such customers; and (2) petitioner gave Hallam a contractual right or covenant that, if, when and to the extent that the latter might thereafter be successful in his solicitation of customer accounts, then and only upon the happening of such contingency, petitioner would become obligated to "release the parties *76 involved in said [customer] contracts" and accounts, so that Hallam would from then on be free to perform future services and derive future income from serving such customers. Thus the covenant contained in the Supplemental Agreement which became the subject of the subsequent litigation, was to operate in effect: (1) Similar to an agreement not to compete or interfere with Hallam's future business efforts; and (2) similar to an agreement to enter into a novation upon the happening of a possible future contingency, under which petitioner would at such future time "release" the customers from their existing contracts and settle their accounts for all work performed up to the date of such release; and under which Hallam, rather than petitioner, would thereafter be free to personally perform the engineering, research and development services for such customers. In determining how damages paid or recovered through litigation or settlement of litigation should be classified and treated for income tax purposes, the important consideration is not when or under what circumstances the $ particular contractual right which provided the basis for the litigation was obtained; but rather, the *77 important factors are: What was the nature of the particular claim on which the litigation was based, and in lieu of what were the damages awarded? Thus, in , affirmed (C.A. 1) , certiorari denied , this Court said: The taxability of the proceeds of the lawsuit like the one involved herein depends upon the nature of the claim and the actual basis of the recovery in the suit. To the same effect are our statements in , and in . Similarly, in , affirming , certiorari denied, , the Court of Appeals said: The test is not whether the action was one in tort or contract but rather the question to be asked is "In lieu of what were the damages awarded?" In the instant case, the particular contractual right which formed the basis for Hallam's suit against *78 petitioner in the Superior Court of Massachusetts, was one which he had theretofore obtained under section II of the Supplemental Agreement of August 20, 1954, i.e.: The right to have petitioner "release" the Springfield Ordnance District from its existing contracts, upon the possible happening of the contingency that Hallam might be successful in procuring the engineering work to be thereafter performed for said District. The fact that Hallam had obtained this right through a supplemental agreement executed at the time when he severed his connections with petitioner, is not important or material for present purposes; for it would make no difference here if he had obtained such right either before or after said severance of his business relationship. The important factor is rather, that the nature and basis of Hallam's suit in the Superior Court was not any refusal of petitioner to vest such right in him; but instead, refusal of petitioner to honor and fulfill its obligations in respect of that right on September 24, 1954, after he had met the specified contingency. The fact that such contractual right had actually vested in Hallam prior to his commencement of the Superior Court suit *79 is self-evident; for unless the right had so vested in him, he would have had no standing before the Superior Court, and no award for damages to him would have been possible. Finally, in determining how the $15,000 damages paid to Hallam should be classified and treated for income tax purposes, we now give consideration to the test stated by the Court of Appeals for the First Circuit in the above-cited Raytheon case: "In lieu of what were the damages awarded?" This question is answered by reference to the Superior Court Auditor's report wherein, as we have hereinbefore found as a fact, damages there awarded in the amount of $20,362.46 (and subsequently adjusted in the compromise settlement to $15,000) were allowed for the following: $7,862 representing "a loss of profits" to Hallam, for a period subsequent to petitioner's refusal of September 24, 1954; and $12,500 representing compensation for personal services which would have become payable to Hallam by the Springfield Ordnance District subsequent to said refusal (computed at the rate of $250 per week for 50 weeks beginning on said date of September 24, 1954). Thus, since the nature of the claim which Hallam sued on was one *80 for lost profits and lost personal compensation, and since the damages he recovered on that claim were awarded "in lieu of" such profits and personal compensation, the amount he recovered qualifies for income tax purposes as ordinary income, and not capital gain from the sale of corporate stock. And considering petitioner's payment of said $15,000 damages, the effect of such payment was to adjust, as between the petitioner and Hallam, the right to the profits and income from services to the Springfield Ordnance District during a period of 50 weeks subsequent to the time of petitioner's refusal to honor its contractual obligation on September 24, 1954. The manner in which this adjustment operated was that whatever taxable profits or income petitioner had derived from its wrongful performance of said services during said period, were reduced by the amount of the $15,000 damages paid to Hallam in the disputed business transaction. We hold that petitioner is entitled to a deduction of said $15,000 for its fiscal year 1957, which is the year in which the litigation in the Superior Court of Massachusetts finally terminated, and in which the amount of the damages awarded in said litigation *81 was finally compromised, settled and paid. We decide the issue for the petitioner. Decision will be entered under Rule 50.